**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **JAMES LOGAN DIEZ #02399291,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 2:23-CV-00269** |
| | § | |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE – CID, et al.** | § | |
| *Defendants.* | § | |

---

### DEFENDANT BRYAN COLLIER'S MOTION FOR SUMMARY JUDGEMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56

---

Defendant Bryan Collier ("Defendant"), by and through the Office of the Attorney General of Texas, files this motion for summary judgement pursuant to Federal Rule of Civil Procedure 56, asserting failure to exhaust administrative remedies, and alternatively the inability of Plaintiff to support his claims with evidence. In support, Defendants offer the following:

## I.        STATEMENT OF THE CASE

Plaintiff James Logan Diez ("Plaintiff"), proceeding *pro se*, is an inmate confined to the custody of the Texas Department of Criminal Justice ("TDCJ") at McConnel Unit in Beeville, Texas.  D.E. 1. On October 19, 2023, Plaintiff brought suit pursuant to 42 U.S.C. § 1983 alleging violations of his First and Fourteenth Amendment rights. Plaintiff filed his Original Complaint (D.E. 1), followed by a supporting brief (D.E. 15), More Definite Statement (D.E. 16), and "Evidentiary Support to Plaintiff's More Definite Statement" (D.E. 20).   Magistrate Judge Julie K. Hampton filed a Memorandum and Recommendation (D.E. 29), to which Plaintiff filed an Objection (D.E. 31). Taking into consideration all of the above, District Judge Neva Gonzales Ramos filed an Order Adoping in Part and Rejecting in Part (D.E. 35).

Addressing only the remaining claims, Plaintiff challenges a new TDCJ mailing policy which requires non-legal mail to be sent to a third-party vendor in Dallas, Texas to be scanned and later

1

uploaded to prisoners' electronic tablets. (D.E. 1 at 4; D.E. 1-1 at 17). Plaintiff asserts this policy violates his First Amendment rights due to a delay in receiving mail, and due to a chilling effect on his speech and the speech of those who would communicate with him, and that a lack of opportunity to be heard about his disgreement with such policy violates his Fourteenth Amendment rights to procedural due process. D.E. 16 at 14-15. Included in the First Amendment claim, is the issue of whether the hypothetical risk of a data leak – resulting from digitized mail being stored on an internet server – constitutes a First Amendment violation relative to chilling speech. D.E. 35 at 4-5. Plaintiff originally sought injuctive relief, reimbursement of his court costs, and punitive damages; however, District Judge Ramos determined the First and Fourteenth Amendment claims would be retained against Defendant in his official capacity for injunctive relief, only. D.E. 35 at 6.

The injunctive relief Plaintiff sought throughout his complaint, and More Definite Statement include: (1) preliminary injunction temporarily restraining Defendant from blanket application of mail scanning policy to the Plaintiff; (2) declaratory relief that the digital mail scan policy is overbroad, excessive and violates First and Fourteenth Amendments; (3) declaratory relief that the policy unduly inhibits and restricts Plaintiff's association and communication rights with readers of his essays/articles, (*See* D.E. 1-1 at 17); (4) to "see officials replaced"; (5) "greater oversight and court review of policies of prison officials enacted with reckless disregard to the practical necessities of penal operations"; (6) for congress and the courts to mandate TDCJ officials (from the frontline staff to executive officials) "to be more fully trained to consider how policies, practices and treatment of prisoners have a very powerful and potentially dangerous consequential effect on free society upon the prisoners release back to society," and (7) "declaratory relief that the digital mail scanning policy is unconstitutional as applied to Plaintiff and other TDCJ prisoners, who have not, been shown through due process to have violated TDCJ correspondence rules as they existed prior to Sep. 6, 2023 or been show through due process to have used or trafficked contraband through the mail"; and (8)

"to permanently [stop] the digital mail policy's enforcement." *See* D.E. 16 at 14-16.

## II.     STANDARD OF REVIEW

On summary judgment, "the plaintiff can no longer rest on the pleadings and the court looks to the evidence before it." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). Summary judgment in favor of the defendant is proper where plaintiff is unable to meet the "substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Gibbs v. Lynn*, 30 F.3d 1490 (5th Cir. 1994) (requiring the defendant to raise a material issue "supported by specific, non-conclusory affidavits or other competent summary judgment evidence.").

Summary judgment should be granted when the moving party conclusively establishes that there is no genuine issue of material fact.  FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25. **There is no issue for resolution at trial unless there is sufficient *evidence* favoring the nonmoving party for a jury to return a verdict for that party.**  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The moving party may satisfy its burden by negating the existence of an essential element of the nonmoving party's case.  *See Celotex Corp.*, 477 U.S. at 325.  Alternatively, if the moving party will not bear the burden of proof at trial on a particular issue, **it may meet its initial burden by pointing out the *absence of evidence* supporting that element of the nonmoving party's case.**  *Id.*; *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996); *Transamerica Ins. Co. v. Avenall*, 66 F.3d 715, 718–19 (5th Cir. 1995).  **The moving party without the burden of proof need only point to the absence of evidence on an essential element of the non-movant's claims or affirmative defenses.** *Celotex*, 477 U.S. at 323-24.

Once the moving party has carried its burden, the burden shifts to the nonmoving party to show that summary judgment is not appropriate.  *Exxon Corp. v. Baton Rouge Oil*, 77 F.3d 850, 853 (5th Cir. 1996).  The nonmoving party cannot discharge its burden by alleging mere legal conclusions or

unsubstantiated assertions; instead, it must present affirmative evidence in order to demonstrate the existence of a genuine issue of material fact and defeat a motion for summary judgment supported by competent evidence. *See Anderson*, 477 U.S. at 249–50; *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus, both movants and non-movants bear burdens of proof in the summary judgment process. *Celotex*, 477 U.S. at 317. The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense. *Id.* at 322.

### III.    EXHIBITS

Exhibit A – Affidavit Regarding Grievance Procedures and Inmate Mail [Diez_051-052]

Exhibit B – Affidavit Regarding the Director Review Committee [Diez_049-050]

Exhibit C – Plaintiff's Grievances from January 1, 2023- July 3, 2024 [Diez_001-048]

### IV.    STATEMENT OF UNDISPUTED FACTS

## A. TIMELINE OF RELEVANT EVENTS

**September 6, 2023** – TDCJ published an announcement on their website ("TDCJ Announcement") of measures they would be taking to detect and prevent the entry of dangerous contraband in its facilities in response to a substantial increase in volume of illegal narcotics entering the system over the previous five years, and an increase in inmate-on-inmate homicides in 2023 – the majority of which TDCJ believes were drug related. *See* TDCJ Announcement. [1] The measures taken included an immediate system-wide lockdown, deployment of additional resources to increase K9 searches, comprehensive searches of all persons entering the facilities, and a roll-out of a New Digital

---

[1] Defendants request Court to take judicial notice of TDCJ's Announcement covering the findings of the systemwide lockdown and search for drugs from September 6, 2023 to October 18, 2023, which is accessible online here: www.tdcj.texas.gov/news/archive/systemwide_lockdown_and_comprehensive_search.html (last visited 10/30/25); *See, Ochana v. Flores*, N.D.Ill.2002, 199 F.Supp.2d 817, affirmed 347 F.3d 266 (a court may take **judicial notice** at the summary judgment stage); see also, Fed. R. Evid. 201.

Mail Program ("TDCJ Digital Mail Rollout"). *See* TDCJ Announcement;[2] *See also*, TDCJ Digital Mail Rollout.[3] TDCJ implemented the digital mail program to stop the "significant increase in K2 and methamphetamines coming into the facilities," through traditional mail, by having certain inmate mail be delivered to a digital mail processing center that would scan and upload the mail to an inmates' tablet. *See* TDCJ Announcement;[4] *see also*, TDCJ Digital Mail Rollout[5]

**October 18, 2023** – TDCJ published weekly results of their efforts until they completed the intensive search and lockdown on October 18, 2023, uncovering  a total of: 330 paper/sheets of Amphetamines (a sheet is estimated at 100-150 hits), 106.5 sheets and 2 oz of Fentanyl, 912.5 sheets and 602 stamps (ID sized paper or smaller) of PCP, 24 sheets and 2 stamps of methamphetamine, as well as other trace amounts of drugs and contraband. *See* TDCJ Announcement.[6] TDCJ also received a total of 289 actionable tips to help locate the contraband and resulted in 1,674 offense reported to the TDCJ Office of Inspector General. *See* TDCJ Announcement.[7]

**October 19, 2023** – Plaintiff filed this suit 43 days after the Digital Mail Policy Rollout was initiated. *See* D.E. 1 at 1. Plaintiff did not file any grievances about the new digital mail program prior to filing suit. *See* Ex. C, at Diez_001- 017); *See also*, Ex. A at Diez_

---

[2] TDCJ Announcement
www.tdcj.texas.gov/news/archive/systemwide_lockdown_and_comprehensive_search.html

[3] Defendants request Court to take judicial notice of TDCJ's Digital Mail Rollout covering the new parameters of the Digital Mail Program, which is accessible online here: www.tdcj.texas.gov/offender_info/digital_mail.html (last visited 10/30/25); *See  Ochana v. Flores*, N.D.Ill.2002, 199 F.Supp.2d 817, affirmed 347 F.3d 266 (Evidentiary Rule 201, governing  judicial notice, allows a court to take judicial notice of adjudicative facts at any stage in a proceeding; therefore, a court may take judicial notice at the summary judgment stage); *see also*, Fed. R. Evid. 201.

[4] TDCJ Announcement: scroll to date September 6, 2023, under "Digital mail" heading.
www.tdcj.texas.gov/news/archive/systemwide_lockdown_and_comprehensive_search.html
[5] TDCJ Digital Mail Rollout www.tdcj.texas.gov/offender_info/digital_mail.html
[6] TDCJ Announcement: scroll to date October 18, 2023
www.tdcj.texas.gov/news/archive/systemwide_lockdown_and_comprehensive_search.html)

[7] *See Id.* (www.tdcj.texas.gov/news/archive/systemwide_lockdown_and_comprehensive_search.html)

**December 12, 2023** – After filing suit, Plaintiff filed one Step 1 grievance complaining about *delays* in receiving mail – the action Plaintiff requested to resolve his complaint was to "[g]o back to direct U.S.P.S mail or deliver scanned mail within (10) days of postmark consistently." *See* Ex. C at Diez_18-19. Plaintiff did not file a Step 2 grievance, or any other grievances related to concerns about the digital mail program. *See* Ex. C, generally (showing Plaintiff's grievances for the period of January 1, 2023, to July 3, 2024).

## B. TDCJ POLICY AND ADMINISTRATIVE GRIEVANCE PROCEDURES

### 1. Uniform Inmate Correspondence Rules pursuant to Board Policy 03.91 (rev 7 December 2023) [8] ("BP-03.91")

"The TDCJ may contract with a private vendor to provide the operation of a private Digital Mail Processing Center ("DMPC"). The TDCJ shall ensure the DMPC operates within the parameters of this board policy." *See* BP-03.91 at 1. The DMPC is a contracted site where inmate USPS general correspondence mail is collected, scanned, and delivered as an electronic communication to TDCJ unit mailrooms. *See* BP-03.91 (rev. 7) at 2. "Digital Mail Service" (DMS) is a service provided by a contracted vendor to deliver electronic communications. *See* BP-03.91 (rev. 7) at 2. TDCJ Unit mailrooms will print electronic communications and deliver the printed copies to inmates who are not in possession of an inmate wireless device. BP-03.91 (rev. 7) at 7.

There is no restriction placed upon the length of incoming or outgoing correspondence – however, all inmate mail is required to be sent and received through duly authorized channels. BP-03.91 (rev. 7) at 7 *(emphasis added)*. The correct authorized channel to receive inbound general

---

[8] Defendants request Court to take judicial notice of Board Policy 03.91 ("BP-03.91") covering Uniform Inmate Correspondence Rules, which is accessible online here: https://www.tdcj.texas.gov/documents/policy/BP0391.pdf (last visited 10/30/25); *See, Ochana v. Flores*, N.D.Ill.2002, 199 F.Supp.2d 817, affirmed 347 F.3d 266 (Evidentiary Rule 201, governing **judicial notice,** allows a court to take **judicial notice of nonadjudicative facts** at any stage in a proceeding; therefore, a court may take **judicial notice** at the summary judgment stage); see also, Fed. R. Evid. 201.

correspondence – anything that is not considered legal, media, or special correspondence – is the Digital Mail Processing Center (DPMC) where it will be digitally scanned and made available on the inmate's secured wireless device. *See* BP-03.91 (rev. 7) at 7, D. TDCJ facilities will only accept the following items addressed to inmates via regular and certified U.S. mail: Legal, Special, and Media Correspondence; Publications sent directly from an authorized source; and Business Correspondence. BP-03.91 (rev 7) at 7, *1. a-c.* "Except for documents requiring an inmate's signature, all General Correspondence addressed to inmates and received by TDCJ facilities will be returned to the sender as refused." BP-03.91 (rev. 7) at 7, *D.* Inmates are prohibited from smuggling letters in or out of the institution. BP-03.91 (rev. 7) at 7. "Contraband," for the purpose of inmate correspondence, is any physical item that an inmate is not permitted to receive through incoming mail, including but not limited to items that present a threat to the safety or security of the staff, inmates, institution, or public; this does not include any written material disapproved for its content." BP-03.91 at 2.

## 2. Inmate Grievance Procedure:

The stated mission of the Inmate Grievance Program, which is under the Administrative Review and Risk Management Division of TDCJ, is to "promote awareness and positive intervention between staff and inmates, *to identify and resolve issues* at the lowest possible level, and to *facilitate the flow of information between the units and agency leaders*." *See* Administrative Review and Risk Management Division ("ARRM") on TDCJ website.[9] "All TDCJ inmates have access to the Inmate Grievance Program to present written complaints related to their classification, personal property, disciplinary status, or other confinement issues within the agency's control." *See ARRM on TDCJ Website*; *See also*, Ex. A at Diez_51. "The Mail System Coordinator's Panel (MSCP) is designed to assist in the

---

[9] Defendants request Court to take judicial notice of the Administrative Review and Risk Management Division covering Inmate Grievances, which is accessible online here: www.tdcj.texas.gov/divisions/arrm/inmate_grievance.html (last visited 10/30/25); *See, Ochana v. Flores*, N.D.Ill.2002, 199 F.Supp.2d 817, affirmed 347 F.3d 266; see also, Fed. R. Evid. 201.

maintenance and coordination of the Uniform Inmate Mail System…. investigates and responds to mail related Step 2 grievances… **submits periodic reports of successes and dysfunction within the system."** *See* Mail Systems Coordinator Panel[10]; *See also*, Ex. A at Diez_51 (explaining the Manager II of the MSCP is the Step 2 signature authority); Ex. B at Diez_051.

### 3. The Director Review Committee

The Director Review Committee ("DRC") operates as the central and final authority for all appeals related to placement and removal of persons from an inmate's visitors list, former employee appeals, inmate contact visitation restrictions, denied correspondence, publications, and other actions of the Mail System Coordinators Panel with regard to the *prohibition of written materials, and placement or removal of individuals on negative mailing lists. See* Ex. B at Diez_49-50; See also, BP- 03.91 (rev 7) at 10-15[11] (explaining the procedures for inspecting general and business correspondence mail received at the unit, denying correspondence, and the appeals process the DRC covers). All decisions made by the DRC are rendered in accordance with BP-03.91, Uniform Inmate Correspondence Rules and TDCJ's visitation plan. Ex. B at Diez_49-50. The DRC does not hear appeals regarding the implementation or revisions to TDCJ policies and procedures. Ex. B at Diez_49-50; *See also* BP-03.91 (rev 17) at 2, 10-15.

### V.    ARGUMENT

### A. PLAINTIFF DID NOT SUBMIT ANY GRIEVANCES PRIOR TO FILING SUIT, AND THUS FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES AS REQUIRED BY THE PRISON LITIGATION REFORM ACT

The crux of the issue here is (1) whether administrative remedies were available to Plaintiff,

---

[10] Defendants request Court to take judicial notice of the Mail Systems Coordinator Panel, which is accessible online here: www.tdcj.texas.gov/divisions/citd/mscp.html (last visited 10/30/25); *See, Ochana v. Flores*, N.D.Ill.2002, 199 F.Supp.2d 817, affirmed 347 F.3d 266; see also, Fed. R. Evid. 201.

and (2) whether Plaintiff exhausted those remedies prior to filing suit. Defendants assert that administrative remedies were available to Plaintiff through TDCJ's two-step Grievance system, and by failing to file any grievances prior to filing suit, Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), as explained below. *See* Ex. C, generally.

The PLRA requires inmates to exhaust "such administrative remedies as are available" before filing suit in federal court to challenge prison conditions – this requirement applies to ***all suits about prison life***, whether they involve general circumstances or particular episodes, and whether they allege excessive force or ***some other wrong***. *See Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983, 984, 152 L. Ed. 2d 12 (2002)(Cf. *Wilson v. Seiter,* 501 U.S. 294, 299, n. 1, 111 S.Ct. 2321, 115 L.Ed.2d 271. Pp. 987–992; *see* 42 U.S.C. § 1997e(a). This exhaustion obligation is mandatory – there are no "futility or other [judicially created] exceptions [to the] statutory exhaustion requirements ...." *Booth v. Churner*, 532 U.S. 731, 741 n.6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Proper exhaustion requires that "the inmate must not only pursue all available avenues of relief but must also comply with all administrative deadlines and procedural rules." *Lindsey v. Striedel,* 486 F. App'x 449, 452 (5th Cir. 2012) (citing *Woodford*, 548 U.S. at 90-91). The Fifth Circuit takes "a strict approach" to the exhaustion requirement. *Butts v. Martin*, 877 F.3d 571, 582 (5th Cir. 2017) (quoting *Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)). **"[M]ere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion**. (emphasis added)" *Id.* (quoting *Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010)). An inmate's grievance must be sufficiently specific to give "officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Id. Butts v. Martin*, 877 F.3d 571, 582 (5th Cir. 2017) (quoting *Johnson*, 385 F.3d at 517).

In Texas, a prisoner must complete the state's two-step grievance process before filing suit under § 1983. *Favela*, 91 F.4th at 1212-1213; *Johnson,* 385 F.3d at 515–16; *see* Tex. Dep't of Crim. Just.

*Offender Orientation Handbook*, 73-75 (2017)[12] The mail related concerns underlying Plaintiff's suit, that he failed to grieve, were confinement issues within the control of TDCJ to address.

> **1. The TDCJ Grievance System was an available administrative remedy for the concerns underlying Plaintiff's suit that Plaintiff was required to exhaust prior to filing suit.**

"All TDCJ inmates have access to the Inmate Grievance Program to present written complaints related to their classification, personal property, disciplinary status, or other confinement issues within the agency's control." *See ARRM on TDCJ Website; See also*, Ex. A at Diez_51. So long as the State's administrative procedure grants "authority to take *some* action in response to a complaint," that procedure is considered "available," even if it cannot provide "the remedial action an inmate demands." *Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir. 2020) (quoting *Booth*, 532 U.S. at 736, 121 S.Ct. 1819 (emphasis added); *see also id.* at 739, 121 S.Ct. 1819 ("Congress meant to require procedural exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible."); *See also Porter v. Nussle*, 534 U.S. 516, 524, 122 S. Ct. 983, 988, 152 L. Ed. 2d 12 (2002) ("Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. See *id.*, at 741, 121 S.Ct. 1819.").

The MSCP is a body within the Classification Division of TDCJ that is designed to assist in coordination of the Uniform Inmate Mail System. Ex. A at Diez_049. **The MSCP has two important tasks that demonstrate the mail related issues underlying Plaintiff's complaint are confinement issues within TDCJ's control to address and thus confer availability in the grievance system:** (1) it serves as the signatory authority on Step Two grievances related to mail

---

[12] Pursuant to TDCJ's grievance policy, first, the prisoner must submit a Step 1 grievance within 15 days of the relevant incident to initiate the grievance process. *Favela*, 91 F.4th at 1212. If the prisoner is dissatisfied with the outcome of the Step 1 response by prison officials, he has 15 days from receipt of the Step 1 response to file a Step 2 appeal. *Id.* Both steps of TDCJ's inmate grievance procedure must be completed for a grievance to be considered exhausted. *Id.*; *Johnson*, 385 F.3d at 515 (citing *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir.2001)). Per the TDCJ *Offender Orientation Handbook*, p. 74, only one issue may be presented per grievance and, whereas Step 1 grievances are used to present an issue for the first time, Step 2 *appeals* are used to *appeal* a Step 1 decision.

issues, and (2) it submits periodic reports of successes and dysfunction within the system to agency leaders. *See* Ex. A at Diez_049; Ex. B at Diez_051; *see also*, Mail Systems Coordinator Panel Description on TDCJ Website.[13] The fact that the MSCP, serves as the signatory authority on Step 2 Grievances related to mail issues, demonstrates the Grievance process is the appropriate administrative remedy to handle mail related issue – including those related to the impact of the Digital Mail Program underlying Plaintiff's complaint. *See* Ex. A at Diez_049 (explaining inmates should file Step 2 concerns related to digital mail policy issues if their Step 1 grievance is denied); *See also*, Ex. B at Diez_052 (The DRC does not hear appeals regarding the implementation or revision to TDCJ policies and procedures). The fact that the MSCP submits periodic reports of successes and dysfunction within the system to agency leaders demonstrates availability of administrative procedures, because such reports are an action that can be taken in response to inmates grievances even if it is not the result the inmate prefers. *See Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir. 2020) (quoting *Booth,* 532 U.S. at 736, 121 S.Ct. 1819 (emphasis added) (So long as the State's administrative procedure grants "authority to take *some* action in response to a complaint," that procedure is considered "available," even if it cannot provide "the remedial action an inmate demands.").

Here, although the grievance system was unable to provide the specific remedy Plaintiff sought in reverting back to the previous mail system that was not digitized, the MSCP could have reported his concerns to agency leaders. By not timely grieving about the underlying events of his claim, with specificity, and prior to filing suit, Plaintiff deprived TDCJ of the opportunity to address complaints internally prior to litigation. *See* Ex. A at Diez_50; See Ex. C at Diez 002- 0017 (Demonstrating absence of Step 1 and Step 2 grievances prior to October 19,2023 filing of suit); *See Porter,* 534 U.S. at 524 ("Congress afforded correction officials time and opportunity to address complaints internally" –

---

[13] Mail Systems Coordinator Panel, which is accessible online here:
www.tdcj.texas.gov/divisions/citd/mscp.html (last visited 10/30/25)

whether by taking corrective action that satisfies the inmate  or filtering out some frivolous claims through internal review – in order to reduce the quantity and improve the quality of prisoner suits, which was the purpose for enacting § 1997e(a).)

## B. THE EVIDENCE BELIES A FIRST AMENDMENT VIOLATION

In order succeed on a claim under § 1983, a plaintiff must have evidence to show a violation of a constitutional right by a person acting under color of state law. *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). Plaintiff first contends the Digital mail policy is not valid and violates his First Amendment rights in two ways: by unnecessarily applying to all inmates even those who do not do drugs, and by chilling his and his would-be potential general correspondent's speech for fear of their data being stored and hacked on an internet server. Per the Fifth Circuit's analysis in *Keys v. Torres*, 737 Fedd. Appx. 717 (2018), the inmate has the burden to show there is no rational relation to a legitimate penological interest. Defendant contends that Plaintiff Diez cannot demonstrate with evidence that the implementation of the digital mailing policy, through (BP-03.91) violated his First Amendment rights.

The Supreme Court has made it clear that prisoners retain only those First Amendment rights of speech which are "not inconsistent with [their] status as ... prisoner[s] or with the legitimate penological objectives of the corrections system." *Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) (quoting *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). The Court has also made it clear that a prisoner's freedom from censorship under the First Amendment's guarantee of free speech with regard to his incoming mail is not the equivalent of freedom from inspection or perusal. *Wolff,* 418 U.S. at 576, 94 S.Ct. at 2984. "The Fifth Circuit has long held that **inmates do not possess a right to the unrestricted freedom of receipt and transmission of mail.**" *Abney v. Sifuentes*, No. 2:19-CV-121, 2019 WL 8512461, at *8 (S.D. Tex. Aug. 12, 2019) (citing *Adams v. Ellis*, 197 F.2d 483, 485 (5th Cir. 1952)), report and recommendation

adopted, No. 2:19-CV-121, 2020 WL 1939681 (S.D. Tex. Apr. 21, 2020). "Prisoners and their correspondents 'enjoy the protections of the First Amendment except to the extent that prison regulations curtailing those protections are reasonably related to legitimate penological interests.'" *Lopez v. Lumpkin*, No. 4:20-CV-3307, 2022 WL 18399530, at 2 (S.D. Tex. Nov. 22, 2022)(quoting *Spence v. Nelson*, 533 F. App'x 368, 371 (5th Cir. 2013). **The courts will generally defer to decisions made by prison officials about the policies they believe are necessary to preserve internal order and security by controlling the types of materials that are allowed into the prison.** *Greer v. Collier*, No. CV H-21-3976, 2023 WL 3628272, at *7 (S.D. Tex. May 23, 2023), *appeal dismissed sub nom. Greer v. Thomas,* No. 23-20311, 2023 WL 9056070 (5th Cir. Sept. 13, 2023)*Id.*; *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."); *see also*, *Baranowski v. Hart*, 486 F.3d 112, 120 (5th Cir. 2007) (citing *Turner v. Safley*, 482 U.S. 78 (1987))

In determining whether a policy is constitutionally valid, the Court considers the *Turner* factors: "(1) whether a valid and rational connection exists between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact of the accommodation on prison guards, other inmates, and the allocation of prison resources generally; and (4) whether there are "ready alternatives" to the regulation in question." *Turner v. Safley*, 482 U.S. 78 (1987); *See also*, Lopez v. Lumpkin, No. 4:20-CV-3307, 2022 WL 18399530, at *2 (S.D. Tex. Nov. 22, 2022).

1. **A valid, rational connection exists between the prison regulation and the legitimate government interest in preventing drugs from enter the prison through the mail for security purposes.**

The first factor, whether a valid and rational connection exists between the prison regulation and the legitimate government interest put forward to justify it, is controlling; the other factors merely

help the court determine if the connection between the policy and a legitimate interest is logical. *Scott v. Mississippi Dep't of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992); See also, *Mayfield v. Tex. Dep't of Criminal Justice, 529 F.3d 599, 607 (5th Cir.2008) (quoting Turner, 482 U.S. at 89–91, 107 S.Ct. 2254)* ("[W]e have noted that rationality is the controlling factor, and a court need not weigh each factor equally."). A policy restricting First Amendment rights is more likely to withstand judicial scrutiny if it is **content-neutral**. *McAlister v. Livingston*, 348 F. App'x 923, 931 (5th Cir. 2009).

BP-3.91 has been held to be rationally connected with a variety of legitimate governmental interests justifying it. *See Leachman v. Stephens,* No. 02-13-00357-CV, 2016 WL 6648747, at *26 (Tex. App. Nov. 10, 2016). Such justifications include the ability to limit the flow of drugs and other contraband into the prison. *See Lopez v. Lumpkin,* No. 4:20-CV-3307, 2022 WL 18399530, at *2 (S.D. Tex. Nov. 22, 2022), *reconsideration denied,* No. 4:20-CV-3307, 2023 WL 348338 (S.D. Tex. Jan. 20, 2023) (explaining, "in *Renfro v. Baker*, Civil Action No. H-21-2172, 2021 WL 4861802 at *2 (S.D. Tex. Oct. 13, 2021), the court found the plaintiff inmate was unlikely to succeed on the merits of his challenge and therefore denied plaintiff's motion for an injunction because **the policy 'prohibiting or limiting card-stock or other papers that are used to smuggle drug' is reasonably related to the legitimate interest of stopping the flow of drugs and contraband into the prison.**" ).

The connection between digitizing mail to limit the amount of various forms of contraband from entering the prison, and maintaining prison security, is rational for the same reasons discussed in *Renfro* regarding card-stock. *See Renfro v. Baker*, Civil Action No. H-21-2172, 2021 WL 4861802 at *2 (S.D. Tex. Oct. 13, 2021). In *Lopez,* it was determined that "in 2021 alone, there were more than 870 items, mailed to inmates across TDCJ facilities, that tested positive for drugs. Often, such contraband comes in the form of a seemingly innocent piece of paper soaked in K2 or bearing traces of other illicit substances." *Lopez,* at 3. The Supreme Court in *Thornburgh* made it clear that a distinction still exists between incoming prison mail and outgoing prison mail, and that distinction revolves

around the differing penological concerns with respect to outgoing and incoming mail – specifically, the Court recognized that "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *See Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir. 1993) (quoting *Thornburgh,* 490 U.S. at 413, 109 S.Ct. at 1881).

Further, the *Lopez* court reasoned that simplifying the inspection process, which was done by hand, was designed to improve inspections and the identification of contraband. *Id.* Likewise, the updated BP3.91 policy, which includes the new change to digitized mail,[14] presents the ability to limit multiple forms of contraband,[15] not just drugs as the Plaintiff presumes. The Fifth Circuit has determined on multiple occasions that prison policies preventing the dissemination of sexually explicit materials are rationally related to legitimate penological interests, and this rationale extends to the implementation of the digital mail policy to achieve such results. *See Ji v. O'Daniel,* No. CV H-21-2663, 2023 WL 8295923, at *4 (S.D. Tex. Oct. 3, 2023), *appeal dismissed*, No. 23-20571, 2024 WL 2264229 (5th Cir. Mar. 21, 2024)( the Southern District Court not only recognized the penological interest in reducing trafficking and trading of sexually explicit images by confiscating them based on a BP- 3.91 policy but **suggested that the future flow of those items were likely to be reduced by the implementation of the digital mailing policy**); see also, *Stroble v. Livingston*, 538 F. Appx. 479, 480 (5th Cir. 2013) (where the Fifth Circuit rejected an inmate's First Amendment claim challenging a prison policy prohibiting possession of sexually explicit images).

More penological interests for using a digital mail center and implementing a digital mail policy are identified on the Securus website. Converting postal mail into electronic communications includes

---

[14] See BP-391 (rev 7) at 6-7 https://www.tdcj.texas.gov/documents/policy/BP0391.pdf
[15] See BP 3.91 at 2, defining "'contraband,' for the purpose of inmate correspondence as any physical item that in inmate is not permitted to receive through incoming mail, including but not limited to items that present a threat to the safety or security of staff, inmates, institution, or public; this does not include any written material disapproved for its content."

the opportunity to dramatically improve investigative intelligence, provide immediate notifications to staff and investigators when particular incarcerated individuals receive mail, and reduce staffing costs by allowing the relocation of staff to other critical areas. [16] In addition to the digital mailing center provided by Securus, TDCJ also contracts with Securus to provide tablets with e-messaging[17] at all TDCJ facilities.[18] The use of e-messaging allows the Plaintiff and other inmates other opportunities to communicate directly with friends and family, and to maintain a connection to the free-world. Significantly, Plaintiff "does not dispute that a penal facility has a legitimate security and penological interest in keeping drugs/poisons out of the prison facility," - in other words, he does not dispute Plaintiff's reason for applying a general mail scanning policy. D.E.1-1 at 3. "Plaintiff asserts this policy is an exercise in futility, overbroad, unnecessary to effect the purpose, and imposes too heavily unconstitutional deprivation of rights without due process," but does cannot support these assertions with evidence. D.E.1-1 at 4.

### 2. Alternative means of exercising rights of communication exist.

Access to e-messaging also contributes to the second factor, which is the availability of alternative means to exercising the right in question (here, the First Amendment right to receive and send communications with members of the free world). "In evaluating the availability of alternatives, the Supreme Court has emphasized that the right in question must be construed 'expansively,' meaning that adequate alternatives need not be perfect substitutes for the curtailed right." Prison Legal News v. Livingston, 683 F.3d 201, 218–19 (5th Cir. 2012). The ability to send and receive mail in order to communicate with friends and family, is not the only means of communication inmates have with the

---

[16] *See* https://securustechnologies.tech/corrections/communication/digital-mail-center/

[17] See BP-3.91 at 2: "'e-message' is an electronic written communication sent to or from a TDCJ inmate. This communication shall be treated in the same manner as incoming general correspondence."

[18] https://www.tdcj.texas.gov/divisions/cid/mgmt_ops_mscp.html

free world – Plaintiff and other inmates may also communicate through e-messaging, phone calls, and in-person visits. Further, not all mail is digitized under the new digitized mail policy – only "General Correspondence" – whereas Legal, Special, Media Correspondence, Publications sent directly from authorized sources, and Business Correspondents are still accepted by TDCJ facilities addressed to inmates via regular and certified mail.[19] Moreover, a "general Correspondent" may send a document requiring the inmate's signature to the inmate in care of the law library at the inmate's current unit of assignment.[20]

Plaintiff acknowledges there are other means for receiving the content of the letters, he simply disagrees with the methods provided to inmates who would like to preserve the letters themselves. D.E. 1 at 11. However, his ability to communicate is not limited to writing, he can also take phone calls or have personal visits. *See Overton v. Bazzetta,* 539 U.S. 126, 135, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (stating that "inmates can communicate with those who may not visit by sending messages through those who are allowed to visit" in concluding that inmates have an alternative means of associating with individuals prohibited from visiting…Alternatives ... need not be ideal, however; they need only be available."); *see also*, *Samford v. Dretke*, 562 F.3d 674, 681 (5th Cir. 2009)

### 3. The impact of the accommodation on prison guards, other inmates and allocation of prison resources generally.

Plaintiff asserts the impact on prison guards, other inmates, and prison resources would be insignificant if the policy was stopped. D.E. 1-1 at 6. He contends drugs in the mail constitute 1% of the drugs getting into TDCJ, and that 90-95% of it is carried in by employees. D.E. 1-1 at 6. He further argues that there are K-9's at every unit and that "it would cost nothing to have the K-9 sniff every mail batch coming into the unit in order to isolate any article of mail carrying drugs and it would allow the controlled delivery and prosecution of both. D.E. 1-1 at 6. Plaintiff asserts without citing to any

---

[19] *See* BP-3.91 at 7: https://www.tdcj.texas.gov/documents/policy/BP0391.pdf
[20] *See Id*.

evidence "the scanned mail policy is an exaggerated response, waste of taxpayer money…and is "diverting millions of dollars from legit security needs into a private sector, for profit company," but does not have the evidentiary support to back this assertion. D.E. 1-1 at 7.  He supports this assertion by saying existing resources would save taxpayers millions of dollars being paid for the futile digitization of mail, because "the K-9's are already on payroll," but provides no other evidentiary support for these contentions. *Id.* Plaintiff can shows no evidence to support these assertions.

Plaintiff neglects to consider the safety of correctional officers who would otherwise be required to process the mail, who could be in danger of exposure to drug laced paper. Alternatively, Plaintiff's assertion that prison guards are the main source of drug smuggling, supports the use of an off-site private facility, because its limits the access the prison officials that would be susceptible to smuggling drug-laced mail within the prison because it takes both the prison officials, and the prison itself out of the equation. The health dangers and impact of drug-soaked strips in correctional facilities is well documented and prevalent among not only TDCJ, but prisons and jails across the country. *See* study showing the danger of drug soaked strips through correctional facilities mail are increasing (https://pmc.ncbi.nlm.nih.gov/articles/PMC11667344/).

## C. THE PLAINTIFF CANNOT DEMONSTRATE A FOURTEENTH AMENDMENT VIOLATION

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV. The first question 'asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."' *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S.

319, 333 (1976); *Crowe v. Smith*, 151 F.3d 217, 230–31 (5th Cir. 1998). "It is axiomatic that due process is flexible and calls for such procedural protections as the particular situation demands." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979).

### 1. No first amendment liberty or property interest violated, and proper procedural mechanisms exist.

Here, Plaintiff contends that his liberty was infringed by the confiscation of the physical copies of his mail, and his property rights were violated or will be violated by the destruction of the physical copies of letters that are set to be destroyed 90 days after they are scanned (absent appeal procedures being initiated). However, Plaintiff does not have a liberty interest in how he receives his mail. Plaintiff asserts the articles of his mail are his personal property entitled to a due process hearing on each letter to determine the governments right and legitimate necessity for the seizure/destruction of Plaintiff's personal property. D.E. 1-1 at 10-11.

In *Hudson v. Palmer*, the Supreme Court held that deprivations of property — intentional or negligent — caused by state officials do not infringe on constitutional due process provided adequate state post–deprivation remedies exist. *Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir. 1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)); *see Parratt v. Taylor*, 451 U.S. 527, 543 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). In other words, under the *Parratt/Hudson* doctrine, random and unauthorized deprivations of property, whether intentional or negligent, neither violate the Constitution nor state a claim under § 1983 of Title 42 when adequate state remedies exist. *See Hudson*, 468 U.S. at 533; *Parratt*, 451 U.S. at 543. The Fifth Circuit has held that even when a deprivation of property is authorized by an administrative directive, such as the order search of an inmate's cell, it falls under the *Parratt/Hudson* doctrine. *Leggett v. Williams*, 277 F. App'x 498, 500 (5th Cir. 2008) (finding the *Parrat/Hudson* doctrine applicable when an inmate contends prison officials conspired to confiscate and destroy his property as an act of retaliation). The Court found the doctrine applicable even though such a claim is based on the purported random and unauthorized acts of prison

officials. *Id.*; *See also, Wanzer v. Rayford*, No. SA-20-CV-00779-XR, 2022 WL 286912, at *13 (W.D. Tex. Jan. 31, 2022). Thus, if Texas provides adequate state post–deprivation remedies, Plaintiff may not assert a due process violation based on the seizure of his property. *See Hudson*, 468 U.S. at 533; *Parratt*, 451 U.S. at 543.

It is well–established that Texas state administrative and judicial systems provide an adequate post–deprivation remedy for inmates whose property has been improperly taken or destroyed. First, the Texas Government Code authorizes the Texas Department of Criminal Justice ("TDCJ") to award up to $500.00 on claims that it lost or damaged an inmate's personal property. *See* Tex. Gov't Code Ann. § 501.007. Second, an inmate may seek relief through the prison grievance system. *See id.* § 501.008 (requiring TDCJ to develop and maintain grievance system for use by inmates housed in its facilities). Finally, and as recognized by the Fifth Circuit, the tort of conversion provides inmates with an avenue for relief for deprivations of personal property. *See Murphy*, 26 F.3d at 543. The burden is on the inmate to show the post–deprivation remedy is inadequate. *Myers v. Klevenhagan*, 97 F.3d 91, 94 (5th Cir. 1996). Thus, the appropriate forum for Plaintiff's property loss claim lies in a Texas state court or in the TDCJ administrative procedures, and he may pursue a claim under section 1983 *only after* those remedies are denied on grounds other than the merits of the claim. *Thompson v. Steele*, 709 F.3d 381, 383 (5th Cir. 1983) (emphasis added).

Plaintiff believes his due process rights were violated because his freedom of speech was limited and his physical property is confiscated, and because TDCJ has not provided any form of due process, to show the Plaintiff violated prison mail rules or drug/contraband rules, and no form of administrative or state appellate process to challenge the policy's application to any given article of correspondence. D.E. 16 (more definite statement) at 12-13. However, Plaintiff was provided with notice. Plaintiff states in his more definite statement, the "Digital Mail FAQ/Digital Mail Rollout!" that was provided on the Inmates Tablet, explained: "All incoming and outgoing correspondence is

subject to delivery, inspection, and rejection. Scanned mail is stored for 90 days before professional disposal." *See* D.E. 16 at 5. *See also*, the TDCJ Website FAQ (https://www.tdcj.texas.gov/faq/digital_mail.html). Plaintiff had the opportunity to be heard by utilizing the inmate grievance policy. (Argued *Supra*). Plaintiff's dissatisfaction with the rejection of his grievance does not amount to a denial of his right to due process. The Fifth Circuit has consistently held that the inmate grievance system is sufficient to satisfy the due process requirements following the rejection or confiscation of inmate mail. *See Stauffer v. Gearhart*, 741 F.3d 574, 587 (5th Cir. 2014) (due process requirements were satisfied because the inmate was able to make his claims through the grievance process and officials responded with a written justification for their denial of relief); *Evans v. Baker*, 442 F. App'x 108, 110 (5th Cir. 2011) (inmate "received the due process protections required when he received notice of the basis for the confiscation of the subject property and a fair opportunity to rebut the allegations concerning his ownership of the property at the [disciplinary] hearing and in his grievances"). United States District Judge George Hanks reached the same conclusion in *Clemons v. Lumpkin*, No. 4:21-cv-4052, 2023 WL 4828378 (S.D. Tex. July 27, 2023) (rejecting inmate Plaintiff's procedural due process claims concerning confiscated mail where inmate had access to the inmate grievance system); *see Shafer v. Lumpkin,* No. 2:23-CV-00053, 2024 WL 3390449, at *5 (S.D. Tex. Mar. 11, 2024), *report and recommendation adopted,* No. 2:23-CV-00053, 2024 WL 3390618 (S.D. Tex. May 7, 2024).

To the extent Plaintiff may argue that he has no way of knowing if his letters are "confiscated" it is important to distinguish that letters can only be rejected for content if they are first accepted into the authorized channel to receive such letters – otherwise, if a personal letter is sent to the unit improperly, and is returned to sender, that is not a confiscation or rejection because it was not sent through the authorized channels. CITE. Further, the Plaintiff received notice of this policy that no personal mail would be accepted by the unit mailroom, and such policy is easily available to any

member of the public who may need to determine where to send prison letters. See *See* D.E. 16 at 5. *See also*, the TDCJ Website FAQ (https://www.tdcj.texas.gov/faq/digital_mail.html).

As for the "confiscation" and destruction of personal letters once they have been scanned at the DMPC and the requisite 90 days have passed, the Plaintiff can utilize the grievance procedure or the Texas state courts. *See Murphy*, 26 F.3d at 543 (A as recognized by the Fifth Circuit, the tort of conversion provides inmates with an avenue for relief for deprivations of personal property). The burden is on the inmate to show the post–deprivation remedy is inadequate. *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996). Thus, the appropriate forum for Plaintiff's property loss claim lies in a Texas state court or in the TDCJ administrative procedures, and he may pursue a claim under section 1983 *only after* those remedies are denied on grounds other than the merits of the claim. *Thompson v. Steele*, 709 F.3d 381, 383 (5th Cir. 1983) (emphasis added).

## VI.    <u>CONCLUSION</u>

For the aforementioned reasons, Defendant prays the court Dismiss the Plaintiff's claim with prejudice for failure to exhaust, or alternatively, for failure to support his claims with evidence.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Chief, Law Enforcement Defense Division

/s/ Shana Sobel
**SHANA SOBEL**
Assistant Attorney General
Texas State Bar No. 24135779
Southern District No. 3870460
shana.sobel@oag.texas.gov
Work Phone: 512-936-1292

Law Enforcement Defense Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, TX 78711-2548
(512) 463-2080 / (512) 370-9814 (fax)

**ATTORNEYS FOR DEFENDANTS**

**NOTICE OF ELECTRONIC FILING**

I, **SHANA SOBEL**, Assistant Attorney General of Texas, do hereby certify that I have electronically submitted for filing a true and correct copy of the above and foregoing **Defendants' Motion for Summary Judgement** was filed in accordance with the Electronic Case Files System of the Southern District of Texas, on October 31, 2025.

/s/ Shana Sobel
**SHANA SOBEL**
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I, **SHANA SOBEL**, Assistant Attorney General of Texas, certify that a true and correct copy of the foregoing **Defendants' Motion for Summary Judgement** has been served by placing same in the U.S. Mail, certified mail, within one business day of October 31, 2025. addressed to:

James Logan Diez, TDCJ#02399291            Via Certified Mail
McConnell Unit
3001 S. Emily Drive
Beeville, TX 78102
*Plaintiff Pro se*

/s/ *Shana Sobel*
**SHANA SOBEL**
Assistant Attorney General